IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

REMO SARACENI,

                Plaintiff,

      v.

MERCHSOURCE LLC, FAO ROC
HOLDINGS, LLC, and
THREESIXTY BRANDS GROUP,
LLC,

                Defendants.

Civil Action No. 22-184-CFC

## MEMORANDUM ORDER

Pending before me is Defendants' Motion to Enforce the Parties'
November 30, 2023 Settlement Agreement.  D.I. 78.

I.

This lawsuit was filed by Remo Saraceni against Defendants MerchSource,
LLC, FAO Roc Holdings, LLC, and ThreeSixty Brands Group, LLC (collectively,
FAO).  FAO owns and operates the FAO Schwarz brand and toy store.  Mr.
Saraceni created the "Big Piano" on the floor of FAO's flagship store in New York
that was featured in the movie *Big* in 1988.  The parties have accused each other in
this litigation of trademark infringement and unfair competition with regard to their
respective intellectual property related to the Big Piano.

Mr. Saraceni filed this suit in November 2021 in the Eastern District of Pennsylvania.  He was 87 years old at the time.  A judge in that court transferred the case to this district in 2022.  The case has been furiously litigated, to say the least.  Mr. Saraceni filed a fourth amended complaint at the end of 2023.

FAO filed the pending motion on January 25, 2024.  That same day, Mr. Saraceni's lawyers at the time—Michael Petock and Tiffany Shrenk—filed a motion to withdraw as counsel.  D.I. 77.  Because Mr. Saraceni consented to the motion and FAO consented to the motion "if Mr. Saraceni is able to obtain new counsel within thirty (30) days," *see* D.I. 77 at 1, I granted the motion that day. D.I. 79.

In a letter filed on January 31, 2024, Mr. Saraceni asked me to give him ninety days to find a new lawyer.  D.I. 83.  The next day, FAO stated in a letter to me that it did not oppose a stay of up to thirty days but that a ninety-day stay was "unreasonably long" and prejudicial to FAO.  D.I. 84 at 1.  I convened a telephone conference on February 16, 2024 to discuss the competing letters.

Mr. Saraceni introduced himself at the outset of the call.  I asked him if he had any lawyers on the line.  He replied, "I have no lawyer.  I have my right hand, Benjamin Medaugh."  D.I. 102 at 3:3–4.  I asked, "Who is that?"  D.I. 102 at 5. Mr. Saraceni replied, "The guy who lives next door to me, an apartment, studio, where he is.  I am in a wheelchair, and I need physical help."  D.I. 102 at 6–8.

2

Mr. Saraceni asked during the call for permission to "read [me] a statement for two minutes and 20 seconds." D.I. 102 at 7:8–9. He proceeded to read the statement. He sounded frail. At times, his speech was garbled and unintelligible. He concluded his statement as follows:

> I am in my 90 years. I'm old, frail, tired, but create in my studio daily. I increasingly rely very much (unintelligible), but I'm very clear minded. I have named my right-hand man Benjamin Medaugh, my heir. (Unintelligible) he was present at the meeting with [FAO]. My goal is to preserve my legacy with (unintelligible) piano, nonprofit foundation to spread love, peace, harmony using my (unintelligible). The growth of my life story can grow on even more (unintelligible) for harmony in time of discord. Thank you very much, my dear honor.

D.I. 102 at 8:7–17.

After Mr. Saraceni spoke, I told the parties that I would stay the case until March 1, 2024, so that Mr. Saraceni could attempt to retain new counsel by that date. D.I. 102 at 8:18–9:20. I then asked if the parties had engaged in a mediation, to which both Mr. Saraceni and FAO's counsel, Mark Johnson, replied "no." D.I. 102 at 9:22–25. The following discussion then ensued:

> MR. JOHNSON: Prior counsel and I had extensive settlement conversations over the past year.
>
> THE COURT: Okay.
>
> MR. JOHNSON: All resulting in what we believe was a final settlement. It culminated following Mr. Saraceni's deposition, where I believe everybody in the room but

3

Mr. Saraceni realized the merits weren't in his favor.  At which point he, frankly, Your Honor, begged [FAO] to settle with him, and we received calls very soon thereafter, exchanged a few drafts, went through a variety of provisions in great depth, got it all tapered, and somehow, some way, Mr. Saraceni decided that he did not settle, and that's how we got here today.

THE COURT: I see.

MR. SARACENI: No.  The settlement was 1 percent, nothing.  The item is mine since 1983.  I have the copyright.  I have the patent.  I have the right for the movie.

THE COURT: Okay.  Well, then what you will need to do is get counsel to make those arguments for you.  All right?

MR. SARACENI: Okay.

D.I. 102 at 10:4–25.

The teleconference concluded with the following exchange:

MR. SARACENI: How about mediation, Your Honor?

THE COURT: I'm not going to order you to participate in mediation.  It's very obvious to me that you've got one view of the world, and the defendant has another view of the world.  I don't think mediation will be productive.

I think, you know, when you bring a lawsuit, you have to be prepared.  You said you've already spent $100,000.  That's a lot of money.  That means the defendant has had to spend money.  I have no view of who is right or who's wrong.  I'm not going to force people to change their views.

4

So I think you would benefit from speaking with a lawyer is what I really think. Lawyers have professional obligations to represent their clients zealously and to assess what they think are the prospects of success or not success in bringing or pursuing a case.

So I think you'd be wise to speak with a lawyer. I don't know who Mr. Medaugh is or what role he plays. I've heard some whispering in the background, which concerns me that he may be giving you advice. Unless he is a lawyer, I would not be relying on him for advice. I think you need to go find a lawyer, and you should do that pretty soon. Okay.

MR. SARACENI: Okay. All right.

THE COURT: Then we're adjourned. Thanks very much.

D.I. 102 at 12:12–13:13.

On February 29, 2024, Mr. Saraceni informed me by letter that he had found "several attorneys willing to make an appearance for [him]" and asked that "another 2 weeks be added to the stay . . . to allow for the attorneys to finish conflicts checks and make an appearance." D.I. 87 at 1. I granted that request, D.I. 88, and two weeks later, current counsel for Mr. Saraceni entered their appearance in the case. D.I. 89; D.I. 90. Counsel filed an opposition to FAO's pending motion thirty days later. D.I. 93.

On June 14, 2024, counsel notified me that Mr. Saraceni had died on June 3, 2024. Counsel stated in their notice that they "will confer with the estate of Mr. Saraceni about a motion for substitution [of party]." D.I. 98 at 1. On August 12,

5

2024, having not heard from counsel, I ordered the parties to submit a joint status report.  On August 16, 2024, counsel informed me that they "plan[ned] to move to substitute Plaintiff by the ninety-day deadline set by [Federal] Rule [of Civil Procedure] 25."  D.I. 99 at 1.  On September 12, 2024, Benjamin Medaugh, "as Executor and personal representative of Mr. Saraceni's estate, Trustee of The Remo Saraceni Trust (the 'Trust'), and as sole beneficiary of the Trust," filed a motion to be substituted as the plaintiff in this case.  D.I. 100 at 1.

II.

Seven months before Mr. Saraceni died, the parties engaged in settlement negotiations.  On November 6, 2023, Mr. Saraceni's lawyer, Mr. Petock, emailed FAO's lawyer, Mr. Johnson, and asked if FAO would be willing to "nail down [a] settlement" in a mediation conducted by a magistrate judge.  D.I. 94-1 at 8.  Mr. Johnson responded that "none of th[e] individuals [associated with FAO] want to settle with [Mr. Saraceni] enough right now to devote any of their time to mediation" and that "to get this done now, we need a formal detailed offer for [FAO] to consider."  D.I. 94-1 at 7.

Two days later—on November 8, 2023—Mr. Petock made the requested detailed offer.  The financial terms of the offer are relevant to the pending motion: an agreement by FAO to pay Mr. Saraceni a "1% royalty on cost of Big

6

Piano[-]branded goods" and a "$50K advance on royalty ($25K at signing, $25K [on] January 30, 2024)." D.I. 94-1 at 7.

On November 10, Mr. Johnson emailed Mr. Petock with "two options for Mr. Saraceni to consider." D.I. 94-1 at 4. The financial terms of "Option 1" in the email were the same financial terms Mr. Saraceni had proposed on November 6 but with a temporal limit—i.e., a royalty to be paid by FAO to Mr. Saraceni "*during Mr. Saraceni's lifetime*" equal to 1% of the cost of any Big Piano-branded goods sold by FAO, and two royalty "prepayments" totaling $50,000, one to be paid upon Mr. Saraceni's signing the agreement and the other to be paid on January 30, 2024. D.I. 94-1 at 5. The temporal limit of the agreement was reiterated in a provision labeled "1(d)," which stated that "[FAO]'s obligation to pay royalties terminates upon Mr. Saraceni's death." *See* D.I. 94-1 at 5. Notably, Mr. Johnson's email did not state or suggest whether the royalty base for Option 1 was geographically limited. As a result, it could not at the time the email was sent, and cannot now, be definitively determined from the email alone if FAO intended or if Mr. Saraceni understood that the royalty base would be for sales worldwide or only within the United States.

On November 17, in an email sent to Mr. Johnson at 9:19 am, Mr. Petock wrote in relevant part:

> With regard to Option 1, can we compromise in any way with 1(d)? Terminates 5 years after [Mr. Saraceni]'s

> death?  Or, I know a little complicated, but he does a lot
> of charitable things with the piano where they don't
> charge (children's hospitals, Variety Club events, etc.,
> etc.), but need to cover expenses (e.g shipping costs for a
> piano rental to the event).  Maybe we could earmark
> royalties after [Mr. Saraceni]'s death to these causes?

D.I. 94-1 at 4.  Approximately three hours later (12:24 pm), in a reply email, Mr.

Johnson stated in relevant part:

> I spoke with [FAO].  Plaintiff's counter proposal is
> rejected.  FAO ha[s] presented two options for Mr.
> Saraceni and both are still on the table as of today.
>
> Please note that [FAO] [is] frustrated by the slow pace
> with which Plaintiff has responded to [FAO's] offers and
> inquiries.  A week has passed while Mr. Saraceni
> contemplated [FAO's] latest offer.  Consequently, we are
> now in a position where [FAO] need[s] to devote
> resources to [a witness's] deposition.  I have been
> instructed that [FAO's] offer will be reduced going
> forward by an amount equal to the attorneys' fees and
> expenses [FAO] incur[s].  Accordingly, [FAO's] offer
> expires at 11:59 pm ET, on Sunday, November 19, 2023.

D.I. 94-1 at 3.

Less than two hours later, at 1:57 pm, Mr. Petock responded in an email:

> Confirming our telephone conversation just now, subject
> to an acceptable written agreement, we have a deal with
> Option #1 below.  Thanks very much.

D.I. 94-1 at 2–3.

On November 28, at 6:31 pm, Mr. Johnson emailed Mr. Petock a draft

settlement agreement.  *See* D.I. 94-2 at 6; *see also* D.I. 81-1.  The financial terms

8

in the draft were the same financial terms set forth in Option 1 of Mr. Johnson's November 10 email except that the draft limited the royalty base to the sale of Big Piano-branded goods in the United States. *See* D.I. 81-1 at ¶¶ 4.1, 4.1.1 (providing that "[f]or all [FAO] Products branded BIG PIANO on the product itself or its packaging and sold in the United States to a purchaser other than [FAO] or [FAO Affiliate] during the lifetime of Mr. Saraceni . . . , [FAO] shall pay Mr. Saraceni a 1% royalty on the cost of goods sold" and that FAO "shall" make two "prepaid sums" of $25,000 that "will be applied to the first $50,000 of royalties due.").

At 7:09 pm, Mr. Petock responded:

I have three points:

1. We discussed having some language addressing "quality control" under the trademark license.  Can we insert something in that regard?;

2. Can we specifically name Ben Medaugh in the release?; and

3. Can we add a paragraph that states that each party will bear its own attorneys['] fees?

D.I. 94-2 at 6.  In a reply email sent at 7:11 pm, Mr. Johnson agreed to the changes and said he would leave the drafting of the changes to Mr. Saraceni's lawyer.  *See* D.I. 94-2 at 5–6.

On November 30, Mr. Petock emailed a redlined version of the settlement agreement to Mr. Johnson.  *See* D.I. 94-2 at 5; *see also* D.I. 81-3.  The financial

terms in Mr. Petock's November 30 draft were identical to the financial terms in the November 28 draft. Later that day, Mr. Johnson sent Mr. Petock a "slightly revised version" of the draft. D.I. 94-2 at 4. This revised version did not alter the financial terms of the prior draft. In a cover email for the draft, Mr. Johnson wrote:

> My redlines seem to have been merged with yours, but there weren't many changes and they were mostly for clarity. Let me know what you think.

D.I. 94-2 at 4; *see also* D.I. 81-4.

On December 2, Mr. Petock wrote back:

> [Mr. Saraceni] is asking why royalties are only for sales in the United States compared to a worldwide license being granted. Would your client consider making them congruent? Thank you.

D.I. 94-2 at 4. On December 4, Mr. Johnson answered:

> The sales internationally are scattered and very low. Reporting becomes a significant hassle for very small sales. This shouldn't move the needle financially and almost certainly wouldn't be the difference between defendants crossing the $5 million threshold while Mr. Mr. Saraceni is still alive.

D.I. 94-2 at 3. Mr. Petock did not respond to this December 4 email.

On December 12, Mr. Johnson emailed Mr. Petock: "Following up. It's been over a week. Where do things stand?" D.I. 94-2 at 3. Later that day, the two lawyers spoke by phone. According to Mr. Johnson's unrebutted declaration, Mr. Petock told Mr. Johnson during the call that Mr. Saraceni "would not proceed with

the agreed[-]upon settlement." D.I. 81¶ 12.  Mr. Petock "indicated that [Mr. Saraceni] was not happy with the terms of the agreement" but, when asked to provide "greater detail" "was unable to identify what specific terms of the agreement were unacceptable to [Mr. Saraceni]." D.I. 81 ¶ 12.  Mr. Petock also indicated during the call that he might seek to withdraw from the case.  D.I. 81 ¶ 12.

On January 24, 2024, Mr. Petock emailed Mr. Johnson a new draft settlement agreement.  D.I. 81-7.  The financial terms in this new agreement are radically different from the financial terms set forth in Option 1 and the November 28 and November 30 draft agreements.  *See* D.I. 81-7; D.I. 94-1 at 5; D.I. 81-1; D.I. 81-3.  In the January 24 draft, the 1% royalty rate applies not merely during Mr. Saraceni's lifetime but *in perpetuity* and not merely to sales of Big Piano-branded goods but to "*all revenues* received by [FAO] in association or operation of *all FAO Schwarz lines of business*." D.I. 81-7 ¶ 4.1 (emphasis added).  In addition, the January 24 draft calls for the two prepaid royalty sums to total $500,000, not $50,000.  D.I. 81-7 ¶ 4.1.1.

The next day, Mr. Petock and his co-counsel filed their motion to withdraw as Mr. Saraceni's counsel.  D.I. 77.  In support of the motion—which, as noted above, I granted because Mr. Saraceni (and FAO in part) consented to it—Mr. Petock stated that "[Mr. Saraceni] insists upon taking action with which his

attorneys have a fundamental disagreement" and that Mr. Saraceni "has failed to

follow advice of counsel which has rendered counsel as essentially useless."

D.I. 77 ¶ 3.

Also on January 25, 2024—hours after the filing of the motion to

withdraw—FAO filed the pending motion.

### III.

The parties agree that I should apply Delaware contract law in resolving

FAO's motion.  They also agree that in determining whether an enforceable

settlement agreement exists under Delaware law, the dispositive legal question is

whether "a reasonable person would conclude, based on the objective

manifestations of assent and the surrounding circumstances, that the parties

intended to be bound by their agreement on all essential terms."  D.I. 93 at 1

(quoting D.I. 80 at 2 (citing *Maya Swimwear Corp. v. Maya Swimwear, LLC*, 855

F. Supp. 2d 229, 234 (D. Del. 2012))).

Motions to enforce settlement agreements closely resemble motions for

summary judgment.  *See Tiernan v. Devoe*, 923 F.2d 1024, 1032 (3d Cir. 1991).

As a result, courts should not "summarily enforce purported settlement

agreements, in the absence of an evidentiary hearing, where material facts

concerning the existence or terms of an agreement to settle are in dispute."  *The*

*Intellisource Grp., Inc. v. Williams*, 1999 WL 615114, at *10 (D. Del. Aug. 11,

1999).  In addition, courts must treat all the nonmovant's assertions as true, and
"when these assertions conflict with those of the movant, the [nonmovant's
assertions] must receive the benefit of the doubt." *Tiernan*, at 1032 (internal
quotation marks and citation omitted).

Mr. Saraceni does not argue or suggest in any way in his opposition to the
pending motion that Mr. Petock lacked the authority to engage on his behalf in the
settlement negotiations Mr. Petock had with Mr. Johnson in November 2023.
Accordingly, based on the email communications between Mr. Petock and Mr.
Johnson, a reasonable person would conclude that the parties had reached an
agreement-in-principle as of November 17, 2023.  A reasonable person would also
conclude, based on those emails and the exchange of written agreements consistent
with those emails on November 28 and 30, 2023, that the parties had reached an
acceptable written agreement that Mr. Saraceni would receive (1) a 1% royalty rate
to be applied to FAO's sales of Big Piano-branded goods during his lifetime and
(2) two royalty prepayments totaling $50,000.

A reasonable person, however, would not conclude that the parties had
agreed as of November 30, 2023—in writing or otherwise—that the royalty base of
sales of Big Piano-branded goods was limited to sales made in the United States.
The agreement-in-principle reached by the parties on November 17, 2023 was
silent about the geographic scope of the royalty base.  And the November 30 draft

13

agreement Mr. Petock sent Mr. Johnson was not a final written agreement.  When, later that day, Mr. Johnson sent Mr. Petock further proposed revisions to the agreement, he said to Mr. Petock, "Let me know what you think."  D.I. 94-2 at 4. Thus, taking Mr. Johnson at his word, he did not believe as of November 30 that the parties had agreed on all terms as of November 30.  Mr. Petock's email response two days later (December 2) makes clear that no final agreement had been reached with respect to the royalty base's geographic scope.  Mr. Petock told Mr. Johnson in the December 2 email that Mr. Saraceni "is asking why royalties are only for sales in the United States compared to a worldwide license being granted," and he asked FAO to "consider making [United States sales] congruent" with worldwide sales—i.e., to include overseas sales in the royalty base.  D.I. 94-2 at 4.

In his reply email to Mr. Petock on December 4, Mr. Johnson did not outright reject Mr. Petock's proposal.  Instead, he said that "sales internationally are scattered and very low" and that limiting the royalty base to domestic U.S. sales "shouldn't move the needle financially."  D.I. 94-2 at 3.  This statement suggests that the change to the royalty base Mr. Petock proposed on December 2 was not material—i.e., not an essential term of the parties' agreement.  But FAO insists in its reply brief that Mr. Petock's December 2 proposal "sought to materially alter [the royalty base] compared to Plaintiff['s] own November 30

14

writing." D.I. 97 at 7 n.1.  In FAO's words: Mr. Petock's December 2 email

constitutes "evidence that [Mr. Saraceni] was trying to renege on his agreement

and change agreed-upon terms." D.I. 97 at 7 n.1.

Because FAO insists that the geographic scope of the royalty base is

material, i.e., essential to the parties' purported agreement, I have no choice but to

deny its motion.  I do so with some reluctance because of the provisions in the

settlement agreement draft sent to FAO on January 24, 2024 that radically altered

the financial terms the parties had clearly agreed on as of November 17, 2023.  *See*

D.I. 81-7; D.I. 94-1 at 2–3.  I am concerned that Mr. Saraceni may have been taken

advantage of and misled in 2023 and, as a result, may have been deprived of the

opportunity to enjoy during his lifetime the 1% royalty rate and advanced royalty

payments of $50,000 he had asked for on November 8, 2023 and FAO had agreed

on November 10, 2023 to pay him.  *See* D.I. 94-1 at 6–7, 4–5.  To address that

concern and to determine how the case should proceed, I will convene a status

conference on October 28, 2024 and require all counsel of record to attend that

conference.

* * * *

NOW THEREFORE, at Wilmington on this Seventeenth day of September

in 2024:

15

1.      Defendants' Motion to Enforce the Parties November 30, 2023 Settlement Agreement (D.I. 78) is **DENIED**;

2.      The Court will convene a status conference on October 28, 2024 at 1:00 p.m. in Courtroom 4B.  All counsel of record shall attend the conference in person.

CHIEF JUDGE